UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**HEATHER EVANS**                                                                         **PLAINTIFF**

vs.                                                            **CIVIL ACTION NO. 3:18-CV-486-CRS**

**AUTO CLUB PROPERTY-CASUALTY INS.**                     **DEFENDANTS**
**CO. a/k/a AUTO CLUB SERVICES, INC.**

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on motion for summary judgment by Defendants. DN 30. Plaintiff filed a response. DN 33. Defendants filed a reply. DN 35. This matter is now ripe for adjudication. For the following reasons, Defendants' motion for summary judgment will be denied.

**I. Legal Standard for Summary Judgment**

Summary judgment is appropriate when the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* In undertaking this analysis, the Court must view the evidence in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of proof for establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the…presence of a genuine dispute." Fed. R. Civ. P. 56(C)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party also "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## II. Background

Plaintiff Heather Evans ("Evans" or "Plaintiff") purchased the home located at 1807 Fairway Drive in La Grange, Kentucky on November 7, 2011 and insured the property with Auto Club Property Casualty Insurance Company ("Auto Club" or "Defendant"). DN 30-2 at 2-4. In June 2013, Plaintiff added a three-season sunroom to the rear of the home. DN 30-2 at 6. In October 2013, Plaintiff noticed water dripping down from an access panel in the ceiling of her sunroom. DN 30-2 at 9. Plaintiff reported a loss to Defendant, which paid a total of $10,975.20 for Plaintiff's claim. DN 4 at 6. Plaintiff used Defendant's payment to cover the cost of replacing her entire roof. DN 30-1 at 3.

In February 2017, Evans noticed "black spots" on the ceiling in the corner of the basement as well as on the master bathroom ceiling. DN 30-2 at 23–24. On April 3, 2017, Plaintiff called Defendant to claim a mold loss in her home related to the 2013 claim. DN 30-2 at 31. Auto Club retained two experts to inspect Plaintiff's home—Terence A. Weigel, P.E. ("Weigel") of Donan Forensic Engineering and Jerry Parker ("Parker") from Environmental Solutions Group, LLC.

Weigel inspected the home on April 10, 2017 and prepared a report dated May 10, 2017. DN 30-8 at 2. Weigel concluded that none of the mold he observed was caused by a roof leak. DN 30-8 at 8. Parker conducted a fungal mold assessment on April 17, 2017 and prepared a report dated April 25, 2017. DN 30-9 at 1–4. Parker recognized "probable mold growth," DN 30-9 at 4–5, and areas of "visible evidence of water stains," DN 30-9 at 8, throughout the home. Parker also identified "past water intrusion…around the basement walls and base boards" but did not specifically identify a roof leak as the source of the mold or water damage he observed. DN 30-9 at 12. Following its receipt of these reports, Auto Club declined to pay Evans' claim. DN 30-2 at 36. Evans contested Auto Club's denial and requested re-inspection. Auto Club responded by sending letters to Evans explaining that the mold damage was not covered under her policy. DN 30-10; DN 30-11 at 1–4.

In fall 2017, Evans contacted Shaun Wallace of Walco Custom Construction, LLC and requested a "full assessment" of her home. DN 33-2 at 1. On February 5, 2019, Wallace wrote a report summarizing multiple inspections and construction work he performed over the previous year and a half. *Id*. Wallace stated it was his "intent to show that AAA has not accepted full responsibility and has been negligent in being thorough with their inspections and non fulfillment of the complete roof damage claim." *Id*. Wallace concluded:

> The majority of the mold damage could have been avoided, if upon initial inspection from the AAA adjuster, he would have realized and pointed out the extent of the water leak throughout the home. Not just the obvious roof replacement. The water issues ceased to exist once the roof was fixed and the mold eventually remediated. Even with no other repairs made, NO MORE MOLD had formed and no other water intrusion has happened. This is another tell tale sign that the mold was due to a specific water event, again consistent with the major roof leak.

*Id.* at 3.

Plaintiff also requested a report from Douglas Peters—a Certified Industrial Hygienist, Certified Safety Professional, and Council-certified Indoor Environmental Consultant—to "determine if roof leaks could have caused mold growth." DN 33-3 at 1. In his report, dated April 11, 2019, Peters stated "water damage and mold growth that was noted in the Testing Interpretation Report by ESG in the attic was due to roof leaks." *Id*. Peters also stated "[i]t is possible that roof leaks in the attic may have contributed to the mold growth on the ceiling along with humidity from the shower." *Id*. at 1–2. Although Peters attributed water damage in the basement to "several sources," he opined that "water traveled down the interior of the wall cavity from above" and "a roof leak over this area would be a likely cause for the observed conditions." *Id*. at 2–3. Peters also reported that the "water staining at the floor level" of the basement stairway "could have been from a roof leak over the northwest corner of the basement." *Id*. at 3.

### III. Discussion

Plaintiff alleges the mold throughout her home was caused by Defendant's refusal "to pay for or authorize the necessary work to remove and mitigate the mold which resulted from the [2013] roof damage nor the work to repair and replace." DN 1-1 at 5. Plaintiff brought four claims against Defendant: (1) breach of contract, (2) tortuous breach of the implied covenants of good faith and fair dealing, (3) unfair trade practices, and (4) bad faith (claims 2 through 4 collectively "Bad Faith Claims"). *Id*. Defendant moves for summary judgment on all claims. The Court will address each claim.

#### A. Claim 1: Breach of Contract

Defendant moves for summary judgment on Plaintiff's breach of contract claim on the following grounds:

(1) there is no evidence that the mold damage she discovered in 2017 was related to a covered loss;

(2) Any property coverage provided by the policy is otherwise excluded by policy exclusions for fungi and wear and tear; and

(3) Evans' material misrepresentations made in the presentation of her claim void the policy.

DN 35 at 1. The Court will address each argument.

### 1. Evidence That 2017 Mold Damage Was Related to a Covered Loss

Defendant moves this Court to dismiss Plaintiff's breach of contract claim because Plaintiff's "simple subjective belief…without any supporting actual evidence is insufficient to satisfy her burden to present evidence of a covered loss." DN 35 at 3. Defendant's argument is without merit.

It is "hornbook law" that the insured has the burden of proving that its claimed loss falls within the coverage of the insurance policy. 19 G. Couch, Couch on Insurance 2d § 79:315 (Rev. ed.) (1983); *see also Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)(holding that, in a bad faith claim, the insured bears the burden of first proving the insurer is "obligated to pay the claim under the terms of the policy"). For the purposes of surviving summary judgment, Plaintiff has met her burden.

After Evans reported a roof leak in October 2013, Defendant "investigated the claim, covered the loss, and made payments for Evans to completely replace her shingled roof and repair the interior water damage." DN 30-1 at 1. Therefore, whatever the cause of the 2013 roof leak, the resulting damage was a "covered loss." In her complaint, Plaintiff alleges that the event that caused the covered loss in 2013 also gave rise to the mold she discovered in 2017. DN 1-1 at 5. Plaintiff's claims are not merely speculative or conclusory. *See Saleh v. City of Warren, Ohio*, 86 F. App'x 866, 868 (6th Cir. 2004)("affidavits [that] merely repeated the [plaintiff's] vague and conclusory allegations ... were insufficient to generate a genuine issue of material fact."). Plaintiff alleges that her 2017 mold damages were caused specifically by the "mold which was never

removed or mitigated in the adjusting or work under the Claim" and Defendant's refusal "to pay for or authorize the necessary work to remove and mitigate the mold which resulted from the [2013] roof damage." DN 1-1 at 5.

Furthermore, Plaintiff supports her causation claim with reports from experts Shaun Wallace and Douglas Peters. Wallace reported that the mold damage he observed in 2017 was caused by mold that Defendant failed to remediate after the 2013 roof leak. DN 33-2 at 3. Wallace also reported that insulation throughout the attic had to be removed and replaced due to mold infestation. *Id*. at 2. Peters, reported "that water damage and mold growth that was noted in the Testing Interpretation Report by ESG in the attic was due to roof leaks." DN 33-3 at 1.

Plaintiff need only present sufficient evidence to raise a question of fact as to whether the mold damages Plaintiff discovered in 2017 were a covered loss under Plaintiff's policy, and she has done so. Defendant argues Plaintiff's witnesses are "inherently unreliable," but this allegation has no bearing on resolution of its motion for summary judgment. DN 30-1 at 18. It is for the trier of fact, not the Court on motion for summary judgment, to assess witness credibility and evaluate competing causation claims.

### 2. Exclusion of Fungi by Plaintiff's Policy

Defendant moves this Court to dismiss Plaintiff's breach of contract claim because the terms of the policy explicitly exclude coverage for mold damage. DN 30-1 at 19. "The burden of establishing that a loss results from a cause falling within a policy exclusion is on the insurer." *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Maryland*, 5 F.3d 982, 984-85 (6th Cir. 1993) (internal citations omitted). Defendant has failed to carry its burden.

To support its mold exclusion theory, Defendant cites the following provisions from Plaintiff's insurance policy:

> EXCLUSIONS
> We do not insure under Part I – Property Insurance Coverages for loss caused directly or indirectly by any of the following, regardless of the cause of the excluded event or damage; other causes of the loss; whether any other cause or event acts concurrently or in any sequence with the excluded event to produce the loss; or whether the loss or event occurs suddenly or gradually, involves isolated or widespread damage or occurs as a result of any combination of these.
>
> 10. Fungi, Wet Rot, Dry Rot or Bacteria. We will not cover any loss caused by or consisting of fungi, wet rot, dry rot or bacteria. We will also not cover any loss, costs or expenses for testing, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of fungi, wet rot, dry rot or bacteria.
> . . .
> In addition, under Coverages A and B, we will not cover loss resulting directly or indirectly from:
> . . .
> 4. any of the following:
> a. wear and tear, marring or scratching, deterioration;
> . . .
> c. rust or other corrosion, wet or dry rot;

DN 30-15 at 14–15. The policy defines "fungi" as "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or bi-products produced or released by fungi." DN 30-15 at 45.

According to the policy, the mere presence of mold does not constitute a covered loss. However, Kentucky courts apply the "efficient proximate cause doctrine" to determine whether mold may constitute a covered loss despite the presence of a mold exclusion provision. *Reynolds v. Travelers Indem. Co. of Am.*, 233 S.W.3d 197, 202-03 (Ky. Ct. App. 2007). Under this doctrine, if a covered event is the proximate cause of the mold damage, then the mold damage is also covered. *See Id.* (finding that the insured had coverage for mold damage, even though "loss caused by mold" was specifically excluded by the policy, because the mold was caused by a

7

covered event). Here, Plaintiff alleges that the mold damage she discovered in 2017 was caused by a covered event that occurred in 2013. DN 1-1 at 5. Viewing the evidence in the light most favorable to the non-moving party, Plaintiff presents a genuine issue of material fact that may not be resolved on summary judgment.

### 3. Material Misrepresentations

Defendant moves this Court to dismiss Plaintiff's breach of contract claim because "Evans made material misrepresentations in the presentation of her claim." DN 30-1 at 19. Defendant alleges Plaintiff made material misrepresentations when she stated, in both interrogatory responses and in her deposition, that she was unaware of the source of any water damage other than the 2013 roof leak. DN 30-1 at 21–23. Defendant refutes Plaintiff's assertions with records from B-Dry Systems, a basement waterproofing company, indicating that Evans reported a leak in her basement in January 2012. DN 30-17 at 7. Another B-Dry record states Plaintiff's B-Dry system had "leaking problems" on June 23, 2014, which required $1,688 in repairs. DN 30-17 at 8. The document is purportedly signed by Heather Evans. *Id*. Defendant provides a B-Dry work authorization card, also purportedly signed by Heather Evans, authorizing the repairs. DN 30-17 at 10. Further, Defendant provides a B-Dry "Certificate of Completion" with heather Evans' contact information and the handwritten comment "Guys were very courteous. Great Job!" DN 30-17 at 10–11.

Plaintiff does not contest the authenticity of these documents nor does she contest that she had knowledge of a leak in her basement. However, Kentucky law prohibits the exercise of the fraud provision because Plaintiff's alleged material misstatements were made during discovery.

In *Home Ins. Co. v. Cohen*, 357 S.W.2d 674 (Ky. 1962), the Supreme Court of Kentucky explicitly overruled a precedent holding that false statements made during depositions invalidate

insurance contracts. Instead, the Court adopted the following holding from the Supreme Court of New Jersey:

> Trial testimony in a case where fraud and false swearing is in issue serves to establish the truth or falsity of the preliminary proofs and the materiality and wilfulness of any false proofs. The fraud and false swearing clause is one beneficial to the insurer and it reasonably extends to protect the insurer during the period of settlement or adjustment of the claim. When settlement fails and suit is filed, the parties no longer deal on the nonadversary level required by the fraud and false swearing clause. If the insurer denies liability and compels the insured to bring suit, the rights of the parties are fixed as of that time for it is assumed that the insurer, in good faith, then has sound reasons based upon the terms of the policy for denying the claim of the insured. To permit the insurer to await the testimony at trial to create a further ground for escape from its contractual obligation is inconsistent with the function the trial normally serves. It is at the trial that the insurer must display, not manufacture, its case. Certainly the courts do not condone perjury by an insured, and appropriate criminal action against such a perjurer is always available.

*Home Ins. Co. v. Cohen*, 357 S.W.2d 674, 677 (Ky. 1962)(citing *Carson v. Jersey City Ins. Co.*, 43 N.J.L. 300 (1881)). At the time Plaintiff made the alleged misrepresentations, Defendant had already denied her insurance claim, compelling the instant suit. Therefore, even if Plaintiff made material misstatements during discovery, the fraud clause does not operate to invalidate the contract.

### B. Counts 2–4: Bad Faith Claims

Defendant moves for summary judgment on Plaintiff's Bad Faith Claims. In a scheduling order filed on October 14, 2018, the parties agreed to "stay discovery on the bad faith claim until the underlying contract claim for insurance benefits is resolved at which time a separate scheduling order can be entered if necessary." On September 17, 2019, This Court ordered that the breach of contract claim should be bifurcated and tried separately from plaintiff's Bad Faith Claims. Therefore, the Court will deny Defendant's motion for summary judgment on Plaintiff's Bad Faith Claims.

9

## IV. Conclusion

For the reasons stated herein, a separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**

February 13, 2020

**Charles R. Simpson III, Senior Judge
United States District Court**