## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

**HEATHER EVANS**                                        **PLAINTIFF**

**vs.**                                  **CIVIL ACTION NO. 3:18-CV-486-CRS**

**AUTO CLUB PROPERTY-CASUALTY INS.**                     **DEFENDANTS**
**CO. a/k/a AUTO CLUB SERVICES, INC.**

### <u>MEMORANDUM OPINION</u>

This matter is before the Court on Defendant's motion for reconsideration pursuant to Federal Rule of Civil Procedure 54(b). DN 40. Plaintiff filed a response. DN 42. Defendant filed a reply. DN 43. This matter is now ripe for adjudication. For the following reasons, Defendant's motion for reconsideration, DN 40, will be granted in part and denied in part, and Defendant's motion for summary judgment, DN 30, will be granted.

### I. <u>Background</u>

This action arises in the context of an insurance claim by homeowner Heather Evans ("Evans" or "Plaintiff") against her insurer, Auto Club Property Casualty Insurance Company ("Auto Club" or "Defendant"), for mold damage she discovered in her home in 2017. She alleges this damage is related to a roof leak she reported to Auto Club in 2013.

In October 2013 Plaintiff discovered water dripping from an access panel in the ceiling of the sunroom on the back of her home. DN 30-2 at 9. Plaintiff reported a loss to Defendant, which dispatched an inspector to determine the cause of the roof leak. DN 30-2 at 13. Plaintiff alleges the inspector told Evans that Auto Club would replace only the shingles above the sunroom which were damaged but would not make a payment because her deductible exceeded the cost of repairs. *Id.* Later, Auto Club agreed to cover the cost of replacing the entire roof because it was unable to locate matching

replacement shingles. *Id*. at 14. Auto Club paid a total of $10,975.20 to resolve Plaintiff's claim. DN 4 at 6. Plaintiff used Defendant's payment to cover the cost of replacing her entire roof. DN 30-1 at 3.

More than three years later, in February 2017, Evans noticed "black spots" on the ceiling in the corner of the basement as well as on the master bathroom ceiling. DN 30-2 at 23–24. On April 3, 2017, Plaintiff called Defendant to claim a mold loss in her home, which she alleged was related to the 2013 claim. DN 30-2 at 31. Auto Club retained two experts to inspect Plaintiff's home—Terence A. Weigel, P.E. ("Weigel") of Donan Forensic Engineering and Jerry Parker ("Parker") from Environmental Solutions Group, LLC, who documented water-related damage throughout the home. DN 20-3 at 1–29; DN 30-9 at 1–44. Weigel and Parker identified mold in the following locations: main attic, master bathroom ceiling, basement, crawlspace, and a front window. DN 20-3 at 11–12; DN 30-9 at 4–5. Neither expert identified the 2013 roof leak as the source of the damage they observed. *Id*. Following its receipt of these reports, Auto Club declined to pay Evans' claim. DN 30-2 at 36. Evans contested Auto Club's denial and requested re-inspection. Auto Club responded by sending letters to Evans explaining that the mold damage was not a covered loss according to her policy. DN 30-10; DN 30-11.

On June 20, 2018 Plaintiff filed a complaint against Defendant in Oldham District Court in Kentucky alleging:

> as a result of the [2013] Claim, the Defendant paid for a new roof and additional work which was performed on behalf of the Plaintiff but refused to pay for or authorize the necessary work to remove and mitigate the mold which resulted from the roof damage nor the work to repair and replace. That the mold appeared in the attic after the time period of the Claim, the existence of which mold was never disputed by either party although the Defendant has claimed that the source of the mold was, at various times, in contradictory fashion from improper grading of the grounds of the Plaintiff's Home, from improper bathroom ventilation, from improper maintenance of the Plaintiff's home, from improper installation or maintenance of windows, from seepage from the basement and numerous other speculations and speculative claims.

DN 1-1 at 5. Plaintiff brought four claims against Defendant—breach of contract (Count I), tortious breach of the implied covenants of good faith and fair dealing (Count II), Unfair Trade Practices (Count

2

III), and Bad Faith (Count IV). *Id*. The parties agreed that a finding on Count I might be dispositive on whether the Defendant acted in bad faith, and agreed to stay discovery on Counts II through IV (collectively "bad faith claims") until after the resolution of the underlying breach of contract claim. DN 9 at 2.

On October 14, 2019, Defendant moved for declaratory and summary judgment, and asked that the court find Defendant has no obligation to pay additional benefits to Plaintiff under its homeowner's policy because:

(1) there is no evidence that the mold damage she discovered in 2017 was related to a covered loss;

(2) Any property coverage provided by the policy is otherwise excluded by policy exclusions for fungi and wear and tear; and

(3) Evans' material misrepresentations made in the presentation of her claim void the policy.

DN 35 at 1. Defendant also argued that, absent a contractual obligation to pay additional benefits, Plaintiff's bad faith claims should also be dismissed. DN 30-1 at 24.

On February 18, 2020, this Court denied Defendant's motion, finding that (1) Plaintiff's experts presented "sufficient evidence to raise a question of fact as to whether the mold damages Plaintiff discovered in 2017 were a covered loss under Plaintiff's policy," DN 37 at 6; (2) that under the "efficient proximate cause doctrine" the mold in question could constitute a covered loss despite the presence of a mold exclusion provision in the insurance contract, DN 37 at 7; and (3) that allegedly false statements made by Plaintiff during deposition did not invalidate her insurance contract, DN 37 at 8–9.

On March 11, 2020 Defendant moved this Court to reconsider its denial of declaratory and summary judgment, arguing that the court committed clear error in (1) finding a genuine issue of material fact as to whether at least some of Plaintiff's claimed 2017 damages were caused by the 2013 covered event, (2) finding that under the "efficient proximate cause doctrine" the mold in

question could constitute a covered loss, and (3) denying dismissal of Plaintiff's bad faith claims. DN 40.

## II. <u>Legal Standard</u>

"While the Federal Rules do not explicitly recognize a 'Motion to Reconsider,' the court interprets a motion for reconsideration as a motion to alter or amend a judgment." *Trident Int'l Corp. v. Kentucky*, 395 F. Supp. 2d 521, 523 (E.D. Ky. 2005). A district court may reconsider an interlocutory order under its common law powers and Rule 54(b). *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959 (6th Cir. 2004). The Court's power under Rule 54(b) is discretionary and may be exercised at any time. *McNulty v. Reddy Ice Holdings, Inc.*, 08-CV-13178, 2009 U.S. Dist. LEXIS 61517, 2009 WL 2168231 (E.D. Mich. July 17, 2009). Rule 54(b) states:

> [A]ny order or other form of decision, however designated, which adjudicates fewer than all of the claims…shall not terminate the action…and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed. R. Civ. P. 54(b).

A district court may reconsider an interlocutory order when there is "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 Fed. Appx. at 959. However, "Rule 54(b) motions may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *WCM Indus., Inc. v. IPS Corp.*, No. 2:13-cv-02019-JPM-tmp, 2015 U.S. Dist. LEXIS 185930, at *6 (W.D. Tenn. Jan. 7, 2015) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)) (internal quotation marks omitted).

### III. <u>Discussion</u>

Defendant brings the instant motion asking the Court to reconsider its denial of Defendant's motion for declaratory and summary judgment. First, Defendant argues the Court should grant summary judgment because neither of Plaintiff's experts "could attest exactly what caused the roof leaks they believe to have caused the damage at issue" and Plaintiff "merely submit[ted] expert reports with only vague and conclusory allegations." DN 40-1 at 10–11. Second, Defendant argues the Court erred in its application of the efficient proximate cause doctrine because the parties "contracted out of any application of the 'efficient proximate cause doctrine'" through the contract's fungi exclusion provision. DN 40-1 at 13. Third, Defendant argues the Court should grant summary judgment on Plaintiff's previously stayed bad faith claims.

After a careful review of the record, the Court finds that Plaintiff has failed to carry her burden of demonstrating a genuine issue of material fact upon which she may prevail at trial. Therefore, the Court committed a clear error of law when it found that Plaintiffs' expert reports could substantiate her claim that the 2017 mold damage constituted a covered loss under Plaintiff's insurance policy. Accordingly, the Court will grant Defendant's motion to amend its prior judgment and will dismiss Plaintiff's breach of contract claim. As Plaintiff's bad faith claims depend upon her breach of contract claim, the Court will grant Defendant's motion to amend its prior judgment and will dismiss Plaintiff's bad faith claims. Regarding the insurance policy's fungi exclusion, the Court finds that the parties did not intend to exclude all mold loss from coverage. Therefore, the Court will not amend that portion of its prior judgment.

## A. Plaintiff Fails to Demonstrate the Existence of a Genuine Issue of Material Fact

It is "hornbook law" that the insured has the burden of proving that its claimed loss falls within the coverage of the insurance policy. 19 G. Couch, Couch on Insurance 2d § 79:315 (Rev. ed.) (1983); see also *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (holding that, in a bad faith claim, the insured bears the burden of first proving the insurer is "obligated to pay the claim under the terms of the policy"). "Under Kentucky law, the party seeking to establish coverage bears the burden of establishing that the incident at issue was within the scope of the policy." *South Fifth Towers, LLC v. Aspen Ins. UK, Ltd*., No. 3:15-CV-151-CRS, 2018 WL 1522349, *8 (W.D. Ky. Mar. 28, 2018) (citation omitted).

Plaintiff's complaint alleges that after the roof leak in 2013, Defendant "refused to pay for or authorize the necessary work to remove and mitigate the mold which resulted from the roof damage nor the work to repair and replace." DN 1-1 at 5. Evans bears the burden of demonstrating how she could prove at trial that the damage identified in the home was caused by a covered event. Evans has not done so.

Plaintiff hired a building contractor, Shaun Wallace of Walco Custom Construction, LLC to provide her with an expert report identifying the mold damage to her home as well as its cause. DN 33-2. Wallace performed his first inspection of the property on October 5, 2017—more than six months after Evans reported her mold loss claim and more than four years after Evans reported the leak in her sunroom. *Id*. By the time Wallace arrived at the home, another contractor, Environmental Solutions Group, had already removed "the wall and ceiling finishes in the basement, the drywall ceiling in the master bathroom, and the batt insulation in the attic." DN 20-3 at 3. During his inspection, Wallace noted the following damage:

> The entire ceiling had to be torn out of the Master bathroom due to damage, the majority of the garage ceiling was damaged and riddled with holes and dangling drywall, the entire front wall in the office had been removed due to damage, and all of

> the insulation in the attic had to be completely removed due to areas and pockets of extreme mold. The basement had to be dismantled and completely exposed to locate all of the pockets of black mold caused from water running down the walls and through the ceiling into the basement and soaking through.

DN 33-2 at 1.

Whether or not mold damage was present throughout the home at the time of Wallace's inspection is not in dispute. What is in dispute is whether Plaintiff can demonstrate that the mold damage was a covered loss according to her insurance policy. She cannot.

Regarding the cause of the mold, Wallace stated:

> Since the roof has been replaced, it would be my opinion that the source of the water stopped when the roof system was installed. Given the time when the roof was replaced, the mold that I saw is most likely from the time of the roof leak prior to the replacement of the roof. I have experience with mold enough to know that what I saw is consistent with mold which has been in place for a period of years so, even though the roof system replacement resolved the source of the water, the mold that I observed was likely never resolved.

DN 33-2 at 3. Wallace further stated:

> The water issues ceased to exist once the roof was fixed and the mold eventually remediated. Even with no other repairs made, no more mold had formed and no other water intrusion has happened. This is another tell tale sign that the mold was due to a specific water event, again consistent with the major roof leak.

DN 33-2 at 2.

In short, Wallace states that (1) the 2013 roof replacement "resolved the source of water" and (2) the damage he observed was "consistent with" a major roof leak. Wallace does *not* state that the roof leak Evans observed over the sunroom of the home in 2013 caused the damage that Evans observed throughout other parts of the property in 2017. In fact, when pressed on this matter during his deposition, Wallace agreed that the "specific leak in the sunroom" could *not* have caused water damage to the front, northwest, or southwest corners of the home—the locations of damage noted by both parties' experts. DN 30-13 at 13.

7

Wallace also agreed that, to the extent that there were roof leaks in places other than the sunroom, he did not know what caused them or when they occurred, other than that it must have been before the roof was replaced in December 2013. *Id*. Even if Wallace's assessment that mold damage throughout the home was caused by "roof leaks" could hold water at trial, he cannot say what caused those leaks. Wallace himself enumerated a litany of potential causes, none of which have anything to do with covered events like hail or wind damage: shingle frequency, nails that are installed with too much pressure, nails that are installed with too little pressure, improper ice and water shielding, nail pops, and age. DN 30-12 at 27–28.

Plaintiff hired a second expert, Douglas Peters of environmental Health Management, to "determine if roof leaks could have caused mold growth" in Plaintiff's home. DN 33-3 at 1. Peters identified mold damage in the following locations: the master bathroom ceiling, the attic above the master bathroom, the basement, and the crawlspace. DN 33-3 at 1-3.

Peters concluded that the mold he saw in the attic was "due to roof leaks," but failed to recognize whether these roof leaks were caused by a covered event. DN 33-3 at 1. Regarding water sources for mold in other areas of the home, Peters only stated that "a" roof leak would be a "likely cause for the observed conditions." DN 33-3 at 3. He also identified mold around the HVAC unit but explicitly stated that "roof leaks were not likely the source of the water stains in this area." DN 33-3 at 3. Like Wallace, Peters agreed in his deposition that the "specific leak in the sunroom" could not have caused the damage Peters had observed throughout the home. DN 30-13 at 13. Peters agreed further that, to the extent there were other roof leaks, he could not say what caused them or when they occurred, other than that they occurred sometime before 2013. *Id*. Peters also agreed that roof leaks could occur due to normal wear and tear. DN 30-13 at 14.

After reviewing Plaintiff's experts' reports as well as their depositions, the Court finds that neither Mr. Wallace nor Mr. Peters present any evidence that mold was in the attic prior to 2013, when the mold growth occurred, what caused the alleged roof leaks, when those leaks started, or whether the cause of the damage would constitute a covered event under Plaintiff's insurance policy. As such, Evans' vague and conclusory allegations that mold damage throughout her home was caused by a covered event is entirely speculative.

In its motion to reconsider, Defendant argues that "the Court incorrectly ruled that Plaintiff's experts provided sufficient opinions to create a question of fact" on the issue of whether the damage throughout Evans' home constituted a covered loss. DN 40 at 1. Upon careful reconsideration, we agree. Even viewing all the facts in the light most favorable to the non-moving party, the Court finds that Plaintiff's expert reports do not support the finding of a genuine issue of material fact for trial. DN 37. Plaintiff's arguments are without merit, and Defendant's motion to reconsider on these grounds will be granted. Accordingly, the section of this Court's prior opinion regarding the existence of a genuine issue of material fact will be amended in accordance with this opinion.

### B. Plaintiff's Policy Allows for Recovery for Covered Mold Losses up to $10,000

In its motion for summary judgment, Defendant argued Plaintiff's policy exclusions explicitly precluded coverage for Plaintiff's mold damage claims. The Court found that summary judgment was inappropriate because, if a covered event was the efficient and proximate cause of the mold damage discovered in 2017, then the mold would not be exempt from coverage under the policy. DN 37 at 7–8. *Citing Reynolds v. Travelers Indem. Co. of Am.*, 233 S.W.3d 197, 202–03 (Ky. Ct. App. 2007).

In the instant motion for reconsideration, Defendant argues the Court's application of the efficient proximate cause doctrine was inappropriate because the parties "contracted out of any application of the 'efficient proximate cause doctrine'" through "anti-concurrent" or "antisequential" causation language in Plaintiff's insurance policy. DN 40-1 at 13. Defendant concludes that "Auto Club's fungi exclusion applies as a matter of law to preclude property damage coverage for all of Evans's claimed damages." *Id.* at 14.

However, in its "motion to correct and clarify its motion for reconsideration," Defendant backpedals on its assertion that the policy excludes mold damage in its entirety. Instead, Defendant states that "*if* the mold damage is caused by a covered loss, then the policy provides payment up to a maximum of $10,000 for mold (fungi) remediation, testing and repairs regardless of the number of covered causes of loss that combine or contribute to the ensuing loss." DN 44 (emphasis in original).

The relevant portions of the policy include the following provisions:

10. **Limited Fungi, Wet Rot, Dry Rot or Bacteria Coverage**

   a. *We* will pay up to a maximum of $10,000 for:

      (1) the total of all loss payable under Part 1 – Property Insurance Coverages caused by **fungi**, wet rot, dry rot or bacteria;

      (2) the reasonable and necessary cost for testing and **remediation** of **fungi**, wet rot, dry rot or bacteria as required to repair or replace property covered under Part 1 – Property Insurance Coverages;

      (3) the reasonable and necessary cost to tear out and repair or replace property covered under Part 1 – Property Insurance Coverages; and

      (4) the reasonable and necessary increase in living expense actually incurred by **you** while that part of the **residence premises** that you occupy is unfit to live in due to the **remediation** of **fungi**, wet rot, dry rot or bacteria;

   if the **fungi**, wet rot, dry rot or bacteria is caused by or results from a loss covered under Part 1 – Property Insurances Coverages.

b. **Our** Limit of Liability under Provision 10 shall not exceed $10,000 in any one policy term regardless of:

(1) The number of covered causes of loss that combine or contribute to the ensuing loss caused by **fungi**, wet rot or dry rot or bacteria;

(2) The number of claims made during the policy term.

. . .

## EXCLUSIONS

*We* do not insure under **Part I – Property Insurance Coverages** for loss caused directly or indirectly by any of the following, regardless of the cause of the excluded event or damage; other causes of the loss; whether any other cause or event acts concurrently or in any sequence with the excluded event to produce the loss; or whether the loss or event occurs suddenly or gradually, involves isolated or widespread damage or occurs as a result of any combination of these.

…

10. *Fungi*, Wet Rot, Dry Rot or Bacteria. *We* will not cover any loss caused by or consisting of *fungi*, wet rot, dry rot or bacteria. *We* will also not cover any loss, costs or expenses for testing, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of *fungi*, wet rot, dry rot or bacteria.

This exclusion does not apply to the extent that coverage is provided under Additional Insurance Coverage 10., Limited Fungi, Wet Rot, Dry Rot or Bacteria Coverage.

In addition, under Coverages A and B, *we* will not cover loss resulting directly or indirectly from:

. . .

4. any of the following:

   a. wear and tear, marring or scratching, deterioration;

   . . .

   c. rust or other corrosion, wet or dry rot;

11

DN 30-15 at 12–15 (emphases in original). The policy defines "fungi" as "any type or form of fungus, including mold or mildew, and any myotoxins, spores, scents or bi-products produced or released by fungi." *Id.* at 8.

As the Court has already recognized, Plaintiff has failed to demonstrate that the mold damage plaintiff reported in 2017 was caused by the 2013 roof leak or any other covered event. Therefore, the mold itself cannot constitute a "loss payable under Part 1." However, even if Plaintiff could demonstrate that the 2017 damage was a "loss payable under Part 1," the Court notes that the terms of the Agreement limit plaintiff's possible recovery.

Plaintiff's policy explicitly limits recovery for "loss payable under Part 1 – Property Insurance Coverages caused by fungi, wet rot, dry rot or bacteria." This language clearly and unambiguously demonstrates that the parties intended for the policy to cover mold damage (1) if the mold damage that results from covered losses payable under Part 1 and (2) that such recovery may not exceed $10,000. Therefore, the parties did not intend to exclude *all* mold loss claims as Plaintiff argued in both its motion for summary judgment and in its instant motion for reconsideration. Accordingly, the Court declines to amend its prior opinion regarding whether mold damage may constitute a covered loss under Plaintiff's insurance policy. DN 37 at 7.

### C. Plaintiff's Bad Faith Claims Should Be Dismissed

In a scheduling order filed on October 14, 2018, the parties agreed to "stay discovery on the bad faith claim until the underlying contract claim for insurance benefits is resolved at which time a separate scheduling order can be entered if necessary." As the underlying contract claim will be dismissed, the Court will amend its prior opinion and will dismiss Plaintiff's bad faith

claims.

## IV. <u>Conclusion</u>

For the reasons stated herein, a separate order will be entered this date in accordance with this opinion.

July 28, 2020

**Charles R. Simpson III, Senior Judge**
**United States District Court**

13